William R. Weinstein
Law Offices of William R. Weinstein
3891 N Hillwood Circle
Tucson, AZ 85750
Arizona Bar No: 038995
wrw@wweinsteinlaw.com
Phone: (914) 997-2205

Plaintiff Pro Se

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF ARIZONA

------------------------------------------------------------------X
William R. Weinstein,                          :
                                               :
                        Plaintiff Pro Se,      :      No. CV-
                                               :
            -vs.-                              :      **COMPLAINT**
                                               :
Pamela J. Bondi, in her official capacity as   :
Attorney General of the United States of America, :
                                               :
                        Defendant.             :
------------------------------------------------------------------X

Dated: April 29, 2025
William R. Weinstein
Plaintiff Pro Se

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

JURISDICTION AND VENUE ........................................................................10

PARTIES..............................................................................................................10

STATEMENT OF FACTS ................................................................................12

A.    The Evolution of the Federal-State Legal Marijuana Conflict..........................12

B.    The Regulation, Administration and Taxation of Adult Use
       Marijuana Under the SSAA .............................................................21

C.    How Adult Use Marijuana is Sold to, Packaged and Purchased by
       Plaintiff and Others in Arizona Under the SSAA .............................................25

D.    The Federal Marijuana Prohibition ...................................................................32

         1.    Relevant Federal Statutes ........................................................................32

         2.    The Shifting Federal Enforcement Response to the
                Legalization of Marijuana by the States....................................................36

                  a.    The Ogden and Cole Memorandums .........................................36

                  b.    Subsequent Developments Regarding the Ogden and
                         Cole Memos ...............................................................................39

                  c.    President Biden's Marijuana Pardons .........................................42

                  d.    Potential Rescheduling of Marijuana Under the CSA ...............43

         3.    The "Hemp Loophole" ..........................................................................47

         4.    The Prohibition on Firearm Ownership Because of Marijuana
                Use...........................................................................................................50

E.     Plaintiff's Possession and Use of Marijuana ......................................................53

    1.     Plaintiff's Marijuana Use Prior to Moving to Arizona...........................53

    2.     Plaintiff's Choice to Move to and Become a Permanent Resident of Arizona ..................................................................................55

    3.     Plaintiff's Possession and Use of Marijuana Since Moving to Arizona .....................................................................................................56

COUNT I
Declaratory and Corresponding Injunctive Relief – Amendment IX...........................59

COUNT II
Declaratory and Corresponding Injunctive Relief – Amendment X ............................63

COUNT III
Declaratory and Corresponding Injunctive Relief – Commerce Clause and Necessary and Proper Clause ......................................................................................67

COUNT IV
Declaratory and Corresponding Injunctive Relief – Amendment II ............................73

PRAYER FOR RELIEF ..............................................................................................75

EXHIBIT LIST

EXHIBIT I: Arizona Marijuana TPT and Excise Taxable Sales and Tax Collections by Period Covered, July 2021-March 2025

EXHIBIT II: Ogden and Cole Memorandums

William R. Weinstein, Plaintiff Pro Se ("Plaintiff"), alleges upon personal knowledge as to himself, and upon information and belief as to all other allegations, for his Complaint ("Complaint") against Defendant Pamela J. Bondi, in her capacity as Attorney General of the United States ("Defendant"), as follows:

### INTRODUCTION

1.      In the two decades since the Supreme Court upheld the total federal prohibition of marijuana in *Raich v. Gonzales,* 545 U.S. 1 (2005), marijuana has been the subject of a nationwide political and cultural sea change. What Justice O'Conner described in her *Raich* dissent joined by Chief Justice Rehnquist and Justice Thomas as a "laboratory" by "a single courageous State … if its citizens choose," *id.* at 42, is now the repudiation by the vast majority of the States and their people, including Arizona and Arizonans, of the full illegalization of marijuana by the federal government.

2.      Despite the total federal marijuana prohibition, thirty-nine states and the District of Columbia have now legalized a comprehensive program for the production, distribution, possession and use of Medical marijuana.[1] Another nine states have legalized a more limited Medical marijuana program based on a low-dose

---

[1] In November 2010, the people of Arizona, by more than 50% of the vote, passed Proposition 203, the Arizona Medical Marijuana Act ("MMA"), a statewide ballot initiative which legalized marijuana for medical use within Arizona by patients with debilitating medical conditions ("Medical marijuana"), and established protections from criminal prosecution for those patients and their physicians and providers.

tetrahydrocannabinol ("THC") and/or cannabidiol ("CBD") product.[2] These 48 States comprise 98.5% of the U.S. population (based on the 2020 Census).

3.      Marijuana is fully illegal under state law for all purposes including medical use in only two states—Kansas and Idaho—whose approximately 4.9 million people comprise less than 1.5% of the U.S. population (based on the 2020 Census).

4.      On November 3, 2020, the people of Arizona, by more than 60% of the vote, passed Proposition 207, also known as the Smart and Safe Arizona Act ("SSAA"), a statewide ballot initiative fully legalizing the possession and use within Arizona of marijuana, marijuana products and marijuana paraphernalia by adults 21 and over (collectively "Adult Use marijuana"). *See* Arizona Revised Statutes, Title 36, Chapter 28.2, entitled "Responsible Adult Use of Marijuana."

5.      In little more than a decade, starting in November 2012 through November 2023, Arizona and 23 other States comprising approximately 180 million persons and 54.5% of the U.S. population (based on the 2020 Census) have now fully legalized both Medical and Adult Use marijuana.[3]

---

[2] THC is the chemical compound generally responsible for marijuana's intoxicating and euphoric effects, as well as reducing pain, inflammation and anxiety, promoting relaxation, and aiding in sleep. CBD does not produce intoxicating and euphoric effects, but can also reduce pain, inflammation and anxiety, and aid in sleep. THC and CBD interact with the body in different ways individually and working together.

[3] In November 2023, by a 57.2% majority vote, Ohio became the 24th State to legalize Adult Use marijuana. Marijuana is also fully legal in the District of Columbia, although its licensed dispensaries are limited to Medical marijuana, and Adult Use marijuana must be purchased outside the District.

6.      These 24 States and their people have democratically decided that the State-regulated and administered production and distribution of marijuana for adult possession and use is NOT a dangerous criminal act as the federal government says, but is legally authorized and acceptable within their borders.

7.      These 24 States and their people have determined that (i) marijuana can be responsibly and safely possessed and used by adults, (ii) decisions by adults regarding any possible risks from the use of marijuana are a matter of individual freedom, and (iii) a State-regulated and administered intrastate program governing the legal production and distribution of marijuana for adult possession and use can result in substantial benefits—both within the home personally to the individual *and* without the home to the State and its people collectively as a whole.

8.      The State of Arizona, where Plaintiff resides, is a prime example of the people of a state democratically deciding to realize the substantial individual and collective benefits to their health, happiness and safety resulting from the legalization of Adult Use marijuana.

9.      Regardless of a doctor's prescription, Adult Use marijuana can relieve pain, promote relaxation and reduce stress, aid in sleep, and enhance spirituality and feelings of happiness and well-being.

10.     Furthermore, Arizona's regulation and administration of the legal production and distribution of Adult Use marijuana enhances individual and public safety and health by seeking to ensure that (i) legitimate, taxpaying business people, and not criminal actors, conduct sales of marijuana, (ii) marijuana products are free of

3

unhealthy contaminants, and (iii) consumers are advised of the products' quantity of active ingredients, relative strength, and lineage and strain with their distinctive effects to guide the consumers' safe and responsible use.

11.    The sale of legally regulated Medical and Adult Use marijuana within Arizona has generated massive amounts of sales and tax revenues to benefit the State and its people in the three-plus years from July 2021 (when the sale of Adult Use marijuana began) through March 2025—more than $5.9 billion of total taxable sales revenues, $470 million of Medical and Adult Use sales taxes, and $640 million of Adult Use excise taxes. *See* annexed Exhibit 1.[4]

12.    Under the SSAA, the more than $640 million of excise taxes imposed and collected by Arizona from the sale of Adult Use marijuana during that period are statutorily required to be allocated to public purposes including improving educational institutions, public safety and highways, and providing public health and social services for communities adversely affected by marijuana arrests and criminalization.

13.    In addition to providing direct funding for public safety, Arizona's Adult Use marijuana legalization was enacted to free up its law enforcement personnel and resources so they can be efficiently utilized where best needed to protect and benefit the people of Arizona.

---

[4] https://azdor.gov/reports-statistics-and-legal-research/marijuana-tax-collection; https://azdor.gov/sites/default/files/document/MJ_byPeriodCovered.pdf (all web addresses in the Complaint last visited April 28, 2025)

14.     When Congress enacted the Controlled Substances Act of 1970 ("CSA") and included the total prohibition of marijuana along with genuinely dangerous and potentially fatal drugs,[5] Congress made a one-size-fits-all, evidentially unsupported determination that marijuana has "a substantial and detrimental effect on the health and general welfare of the American people"—now overwhelming rejected by States comprising 98.5% of Americans regarding Medical marijuana and a 54.5% majority of Americans regarding Adult Use marijuana.

15.     Despite the total federal prohibition, more than 55 million American adults have used marijuana in the past year, and more than 35 million Americans use it on a monthly basis. All told, more than 78 million Americans have tried marijuana during their lifetime.

16.     Further, almost 2/3 of Americans believe that regular use of alcohol and tobacco are more harmful to a person's health than regular marijuana use—four times as many people as those who think marijuana is more harmful than alcohol and tobacco.

17.     The response of the federal government to this political and cultural sea change by the States and their people has been a confused and inconsistent attempt to appear to preserve some semblance of federal enforcement authority over the States' regulated and administered intrastate marijuana markets and their peoples' possession

---

[5] According to the Drug Enforcement Administration ("DEA"), "[n]o deaths from overdose of marijuana have been reported." https://www.dea.gov/factsheets/marijuana

and use, while repeatedly contradicting and undermining that enforcement authority, including by, *inter alia*:

(i) Congress enabling the government of Washington D.C. to decriminalize Medical marijuana under local ordinance in 2009;

(ii) Congress for the past decade affirmatively prohibiting the use of federal funds for the enforcement of federal marijuana laws against the States' legal Medical marijuana markets;

(iii) the Department of Justice ("DOJ") deprioritizing marijuana enforcement for the past 15 years in states that have legalized marijuana in light of, *inter alia*, the DOJ's "limited investigative and prosecutorial resources"; and

(iv) President Biden issuing thousands of full pardons in 2022 and 2023 for the commission or conviction of many simple marijuana possession offenses while calling the federal prohibition a "failed approach."

18.    The "closed regulatory system" and "watertight nationwide prohibition" that the majority of the Supreme Court "found necessary to justify the Government's blanket prohibition [of marijuana] in *Raich*," *see Standing Akimbo LLC v. United States,* 141 S. Ct. 2236, 2238 (2021) (mem.) (Thomas, J., Statement respecting denial of certiorari)—if it ever existed (and it has never existed in Plaintiff's experience)—has been progressively dismantled and now demolished by the States and their people.

19.    The federal government itself has further destroyed the purported "closed regulatory system" by enacting and allowing to continue a "loophole" based on its exclusion of "hemp" from the definition of marijuana under the CSA.

20.     This "hemp loophole" has resulted in the production and widespread interstate distribution of unregulated and unsafe "hemp THC"—which has effects when ingested comparable to those of the THC in non-hemp marijuana that is fully illegal under federal law. *See* 21 U.S.C. § 802(16); 21 U.S.C. § 812(c), Schedule I, § (c)(17). Because of the absence of safety and quality controls and adequate protections for children and other minors, thirteen States have fully illegalized this "hemp THC" and another seven have regulated or restricted it, including Arizona and many states that have fully legalized both Medical and Adult Use marijuana.

21.     The federal government has always been wholly dependent on the States for its attempt to effectuate its total prohibition. As stated in Arizona's MMA when enacted in 2010, 99 out of every 100 marijuana arrests in the United States were made under state rather than federal law.

22.     It is impossible for the federal government, with what the DOJ has repeatedly described as its "limited investigative and prosecutorial resources," to exercise any meaningful prohibition enforcement authority over the 24 independent State-regulated and administered intrastate Adult Use marijuana markets and the 48 intrastate Medical marijuana markets with total combined Medical and Adult Use sales in 2024 exceeding $30 billion—including Arizona, where Medical and Adult Use sales totaled almost $1.4 billion.

23.     Even assuming arguendo that the total federal marijuana prohibition at some point possibly preserved the health and welfare of the American people,[6] it can no longer do so for Arizona and Arizonans—or the other States and their people—who have exercised their democratic right to adopt a better policy and mechanism to affirmatively improve their individual and collective health, happiness and safety by legalizing, regulating, administering and taxing the intrastate production, distribution, possession and use of Medical and Adult Use marijuana within their borders.

24.     The federal preemption, prohibition and criminalization of the decision by the people of Arizona (and other States) to fully legalize, regulate, administer and tax Adult Use marijuana to protect, promote and improve their health, happiness and safety is an unconstitutional encroachment on the individual and collective rights retained by and reserved to Plaintiff and Arizona and its people that the Ninth and Tenth Amendments were designed and intended to prevent, and exceeds and violates the outer boundaries of the Commerce Clause.

25.     Furthermore, the application of the federal prohibition under 18 U.S.C. §§ 922(d)(3) and 922(g)(3) to prevent Plaintiff's exercise of his right to purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona violates his rights under the Second Amendment.

---

[6] In fact, the federal prohibition has damaged the health and welfare of the American people, *inter alia,* by relegating the marijuana market exclusively to organized crime, prohibiting medical research into marijuana's numerous health benefits, and needlessly destroying lives in racially and ethnically disproportionate numbers and adversely affecting their communities as a result of simple marijuana possession arrests and convictions.

26.    By his Complaint, and as alleged in detail, *infra,* Plaintiff seeks declarations and corresponding permanent injunctive relief by the Court that:

(i) the federal criminalization of Plaintiff's possession and use of Adult Use marijuana which is legal under the laws of Arizona violates his fundamental right to the pursuit of happiness and safety retained by the people under the Ninth Amendment;

(ii) the federal criminalization of Plaintiff's possession and use of Adult Use marijuana which is legal and authorized under Arizona's comprehensive intrastate market system for the regulation, administration and taxation of the production, distribution, possession and use of Adult Use marijuana violates Arizona's State sovereignty under the Tenth Amendment;

(iii) the federal criminalization of Plaintiff's possession and use of Adult Use marijuana under Arizona's comprehensive, highly regulated intrastate market system governing Adult Use marijuana exceeds the outer boundaries of and violates the Commerce Clause; and

(iv) the application of the federal prohibition under 18 U.S.C. §§ 922(d)(3) and 922(g)(3) to prevent Plaintiff's exercise of his right to purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona violates his rights under the Second Amendment.[7]

---

[7] To be clear, Plaintiff is **not** seeking by his Complaint to establish a separate individual right under the U.S. Constitution to possess and use marijuana. The right to possess and use marijuana he is seeking to establish is derived from the democratic decision of the people of Arizona to legalize Adult Use marijuana to protect, promote

## JURISDICTION AND VENUE

27.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case presents substantial questions of federal law under the CSA and the U.S. Constitution. The Court additionally possesses jurisdiction to issue a declaratory judgment under 28 U.S.C. § 2201(a).

28.     Venue is proper in this District under 28 U.S.C.§ 1391(e)(1) because the action is against an officer of the United States in her official capacity, the case does not involve real property, and Plaintiff resides in this District.

## PARTIES

29.     Defendant Pamela J. Bondi is the Attorney General of the United States and is named in her official capacity. Her principal place of business is in Washington, D.C.

30.     Plaintiff, who turned 70 years old on November 5, 2024, established permanent residency in Tucson, Arizona in July, 2021. Plaintiff is an attorney who has been practicing law for more than 40 years, and as a result of his efforts in connection with his cases, almost $900,000 has been distributed to approved charities.

---

and improve the health, happiness and safety of Plaintiff and all Arizonans individually and collectively. It is up to each State and its people to democratically decide the legality of Medical and Adult Use marijuana—an issue which has been and is the subject of vigorous political debate in Idaho and Kansas.

And to be clear, Plaintiff's Complaint is limited solely to marijuana, whose facts, including the virtually complete repudiation by the States of full federal illegalization, and the legalization of Adult Use marijuana by States comprising a majority of the U.S. population, are unique among all "controlled substances" under the CSA.

31.    Plaintiff is admitted to the courts of three states (including Arizona as of March 6, 2024), four federal district courts (including the District of Arizona as of April 17, 2024), six federal appeals courts, and the Supreme Court of the United States. Plaintiff is in good standing with each and every of these courts and has never had any disciplinary action taken against him in any of these courts.

32.    As further alleged herein, Plaintiff currently possesses a small amount of Adult Use marijuana that is well within the limits for legal possession and use under Arizona law, and uses that marijuana intermittently each month.

33.    Because marijuana is illegal for all purposes under federal law, and because Plaintiff possesses a small amount of Adult Use marijuana fully legal under Arizona law, he is personally and reputationally stigmatized as a criminal by the federal government, his home is subject to search by federal law enforcement, any marijuana he possesses within his home is subject to seizure, and he is subject to possible arrest, trial, conviction, imprisonment and fines for such possession. And even for simple possession, the federal criminal penalties increase from misdemeanor to felony after the first conviction.

34.    Plaintiff intends to continue his purchase, possession and intermittent use of Adult Use marijuana which is legal and authorized under Arizona law, regardless of its full illegalization by the federal government.

## STATEMENT OF FACTS

**A.    The Evolution of the Federal-State Legal Marijuana Conflict**

35.    Although there is circumstantial evidence that marijuana has been used for more than 5000 years, the oldest direct evidence of its use is found in China and is 2500 years old. According to a study by Robert Spengler, an archaeobotanist at the Max Planck Institute for the Science of Human History in Jena, Germany, "it is clear that the plant has a long history of human use, medicinally, ritually, and recreationally, over countless millennia."

36.    In the United States marijuana was widely utilized as a patent medicine (i.e., sold without prescription) during the 19th and early 20th centuries, and was described in the *United States Pharmacopeia* for the first time in 1850.

37.    From the founding of the country until 1970, the legal status of marijuana was up to each state.

38.    Utah passed the first state statute prohibiting the sale and possession of marijuana in 1915. By 1931 twenty-two states had enacted such legislation.

39.    A survey conducted by legal scholars of then-contemporary newspaper and periodical commentary led them to conclude that "the most prominent [influence in the passage of state illegalization laws] was racial prejudice." During that time, "marijuana legislation was generally a regional phenomenon present in the western

and southern states. Use of the drug was primarily limited to Mexican-Americans who were immigrating in increased numbers to those states."[8]

40.     In 1937, rather than ban marijuana, Congress enacted the Marihuana Tax Act of 1937, which "was intended merely to impose a very high tax on transfers [of marijuana] and not to prohibit such transfers entirely." *Leary v. United States,* 395 U.S. 6, 21 (1969). The act imposed criminal penalties including prison and significant fines if the tax was not paid. The Marihuana Tax Act stayed on the books until 1969, when the Supreme Court struck it down in *Leary* as a violation of the Fifth Amendment protection against self-incrimination.

41.     After the 1937 Act was struck down, marijuana was totally federally illegalized in 1970 by passage of the Controlled Substances Act ("CSA").

42.     President Nixon's real motivation for the full illegalization of marijuana as a linchpin of his "war on drugs" was finally disclosed in 2016 by the widely reported publication in *Harper's Magazine* of a 22 year old, 1994 interview with John Ehrlichman, Nixon's Assistant to the President for Domestic Affairs:

> You want to know what this [war on drugs] was really all about? The Nixon campaign in 1968, and the Nixon White House after that, had two enemies: the antiwar left and black people. You understand what I'm saying?
>
> We knew we couldn't make it illegal to be either against the war or black, but by getting the public to associate the hippies with marijuana and blacks with heroin, and then criminalizing both heavily, we could disrupt those

---

[8] Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va. L. Rev. 971, 1010-11 (1970).

communities. We could arrest their leaders, raid their homes, break up their meetings, and vilify them night after night on the evening news.

Did we know we were lying about the drugs? Of course we did.[9]

43.    The National Commission on Marijuana and Drug Abuse was created in connection with the passage of the CSA to study marijuana use in the United States and report their findings to then-President Nixon, Congress and the public. On March 22, 1972, the Commission's chairman, former Pennsylvania Governor Raymond P. Shafer, presented that report, entitled "Marijuana, A Signal of Misunderstanding," which favored ending marijuana prohibition and adopting other methods to discourage use.[10] The recommendations of the Shafer Report were ignored by Nixon and the federal government.

44.    Shortly after passage of the CSA, the states began to move away from the federal government's full illegalization of marijuana, evolving to what is now a complete repudiation by the vast majority of the States and their people of the CSA's total prohibition.

45.    Beginning in 1973 with Texas and Oregon, some states decriminalized the possession of small quantities of marijuana. By 1978, 12 states had done so.

46.    Next was the legalization of Medical marijuana by states, some by the legislature and some by ballot measure. California was the first State, in 1996. As

---

[9] https://harpers.org/archive/2016/04/legalize-it-all/

[10] http://www.druglibrary.org/schaffer/Library/studies/nc/ncmenu.htm ("Shafer Report")

more states legalized Medical marijuana, other states that did not legalize Medical marijuana nevertheless decriminalized small quantity possession.

47.    As a number of states were newly legalizing Medical marijuana or decriminalizing small quantity possession, the legalization of Adult Use marijuana by the States began in November 2012, with ballot initiatives in Colorado and Washington. The legal landscape then changed with extraordinary speed, and within eleven years, by the end of 2023, 24 States and the District of Columbia had fully legalized Adult Use marijuana, and another 24 States had legalized marijuana in some form solely for medical purposes.[11]

48.    In addition to full legalization, and to counter the negative consequences of prior criminalization, Arizona and 24 other States and the District of Columbia have enacted legislation explicitly permitting or facilitating the process of having select marijuana convictions expunged, vacated, otherwise set aside, or sealed from public view (collectively "expunged").

---

[11] Marijuana is fully legal for both Medical and Adult Use in seven States included within the U.S. Court of Appeals for the Ninth Circuit that comprise more than 95% of its population (according to the 2020 Census): Alaska, Arizona, California, Montana, Nevada, Oregon and Washington. Adding Hawaii, which has legalized only Medical marijuana but has decriminalized small quantity possession, brings the number to more than 97%. Marijuana remains fully illegal only in Idaho, which comprises 2.75% of the Ninth Circuit's population.

Arizona is domestically bordered on all sides by States that have legalized marijuana: Medical and Adult Use in California, Nevada, Colorado and New Mexico, and Medical in Utah.

49.    As a result of these laws, more than two million low level state marijuana convictions have been expunged and are in the process of expungement nationwide, in States including, *inter alia*, California (more than 200,000), Illinois (more than 800,000), New Jersey (more than 350,0000) and Virginia (almost 400,000).

50.    In Arizona, it has been estimated that between 100,000 and 250,000 people have an arrest, conviction, or adjudication that are eligible for expungement under the SSAA. The Arizona expungement process has been slow, however, although in the middle of 2023 the Maricopa County Attorney had sought almost 20,000 expungements.

51.    States are also issuing pardons—including mass pardons—for marijuana possession convictions. In 2022, the Governor of Oregon pardoned more than 47,000 individuals. In early 2024 the governor of Massachusetts issued what are estimated to be several hundred thousand pardons for anyone who was ever convicted of a marijuana misdemeanor in the state. And in June 2024, the Governor of Maryland issued an executive order pardoning 175,000 Maryland convictions related to the possession of cannabis, including convictions for misdemeanor possession of cannabis and certain convictions for misdemeanor possession of drug paraphernalia.

52.    In the United States the production and distribution of fully legal marijuana is now controlled by 24 independent, self-administered and self-regulated intrastate market systems, with another 24 States controlling the intrastate production and distribution of marijuana in some form solely for medical purposes.

16

53.    Total U.S. sales of state-legalized marijuana for 2024 are estimated to have been as much as $30.1 billion. It is predicted that this number will reach almost $48 billion by 2028.

54.    In 2024, the total tax collections by the states with operational marijuana markets equaled approximately $3.92 billion.

55.    According to the January 2024 Pew Research Center survey, "[a]n overwhelmingly majority of U.S. adults (88%) say either that marijuana should be legal for medical use only (32%) or that it should be legal for medical *and* recreational use (57%). Just 11% say the drug should not be legal in any form. These views have held relatively steady over the past five years."[12]

56.    A number of reasons for and benefits to be derived from the legalization of marijuana have been asserted by the states. In the SSAA, the people of Arizona have declared that Adult Use marijuana should be legal "[i]n the interest of the efficient use of law enforcement resources, enhancing revenue for public purposes, and individual freedom." As alleged above, the total tax revenues generated "for public purposes" in Arizona from the sale of Medical and Adult Use marijuana from July 2021 to March 2025 have totaled more than $1.1 billion (*see* Exhibit 1).

57.    However, one of the most fundamental reasons that the people of 24 States have fully legalized Medical and Adult Use marijuana, and another 24 States

---

[12] https://www.pewresearch.org/short-reads/2024/04/10/facts-about-marijuana/ (emphasis in original).

have legalized Medical marijuana, is because marijuana's responsible use makes

Plaintiff and others feel ***better***.[13]

58.     The medicinal effects of Medical marijuana in treating some of the most

severe symptoms of a wide range of debilitating medical conditions can be

extraordinary, and more effective and safer for some patients than any other option

available under the CSA.

59.     Physicians are reporting that a growing number of adults suffering from

dementia are successfully using marijuana to sooth their agitation, as well as

alleviating their anxiety and pain, and improving their sleep, appetite and mood. *See*

"A Surprising Source of Dementia Relief: Cannabis," *Wall Street Journal*, November

11, 2024.

60.     Adult Use marijuana can provide significant relief from severe or less

severe pain and other symptoms without the need for physician involvement. For

some people, as little as 5 milligrams or less in edible form, or a small fraction of a

gram of smokable flower, can provide relief from pain and stress, increase relaxation

and aid with sleep.

61.     Marijuana can enhance spirituality.[14] For thousands of years marijuana

has had deep roots in and been part of the spiritual practices of Hinduism, Islam,

---

[13] *See, e.g.,* https://www.merriam-webster.com/dictionary/better, Definition 2: "improved in health or mental attitude."

[14] A 2009 national consensus conference focusing on the connection between spirituality and health arrived at the following definition of spirituality: "Spirituality is the aspect of humanity that refers to the way individuals seek and express meaning

Rastafarianism, and indigenous traditions in Asia, Africa, and elsewhere. Recent research on the use of marijuana by a sample of contemporary adults including an assessment of their spiritual and psychological characteristics determined that 66% experienced spiritual benefit from its use.[15]

62.    Aside from medical and spiritual benefits, people use marijuana because it makes them feel good and it makes them feel happy.

63.    Marijuana is an intoxicant, which is "a substance …that produces feelings of pleasure or happiness."[16]

64.    Marijuana is a euphoric, and euphoria is "the experience (or affect) of pleasure or excitement and intense feelings of well-being and happiness."[17]

65.    Marijuana causes laughter,[18] which an expression of happiness.

---

and purpose and the way they experience their connectedness to the moment, to self, to others, to nature, and to the significant or sacred."
https://pmc.ncbi.nlm.nih.gov/articles/PMC4038982/

[15] https://pubmed.ncbi.nlm.nih.gov/34225558/

[16] https://dictionary.cambridge.org/us/dictionary/english/intoxicant

[17] https://en.wikipedia.org/wiki/Euphoria  As recognized by former Vice President Kamala Harris during a February 2019 interview calling for federal legalization, "[I]t gives a lot of people joy. And we need more joy." "And I inhaled."
https://www.politico.com/story/2019/02/11/kamala-harris-2020-marijuana-legalization-1163795

[18] Shafer Report,
https://www.druglibrary.org/schaffer/Library/studies/nc/ncchap2_33.htm

66.     Happiness is healthy. It can improve heart health, increase the ability to deal with stress more effectively, strengthen the immune system, help reduce pain, promote a greater sense of wellbeing, and increase life longevity[19]

67.     As a euphoric, marijuana can act synergistically with and intensify the pleasure derived from other euphoric activities, including enjoying music, films and other performing arts, and food. Marijuana enhances the release of dopamine, and so do these and other pleasurable life activities.

68.     Standing alone or in combination with these other euphoric activities, marijuana can also enhance daydreaming and the wandering mind,[20] which can counter stress and anxiety, pleasurably induce relaxation and aid the creative process.

69.     Feeling better when getting relief from some of the most severe symptoms of a wide range of debilitating medical conditions, and from severe or less severe pain, is healthy.

70.     Feeling better from the reduction and elimination of stress, anxiety and agitation, and an increase in relaxation and sleep, is healthy.

71.     Feeling better while exploring one's spirituality and daydreaming is healthy.

72.     Laughter, happiness and joy are healthy.

---

[19] https://positivepsychology.com/benefits-of-happiness/

[20] Shafer Report, *id.*

20

**B.    The Regulation, Administration and Taxation of Adult Use Marijuana Under the SSAA**

73.    Arizona fully legalized Adult Use marijuana with the passage of the SSAA on November 3, 2020, thereby providing for the creation and maintenance of a closed intrastate system for the regulation, administration and taxation of Adult Use marijuana within Arizona. *See* A.R.S. § 36-2850, *et. seq.*, entitled "Responsible Adult Use of Marijuana."[21]

74.    In passing the SSAA, the people of Arizona approved the following findings and declaration of purpose set out in Section 2 of the initiative:

**Section 2**. Findings and declaration of purpose

The People of the State of Arizona find and declare as follows:
1. In the interest of the efficient use of law enforcement resources, enhancing revenue for public purposes, and individual freedom, the responsible adult use of marijuana should be legal for persons twenty-one years of age or older, subject to state regulation, taxation, and local ordinance.
2. In the interest of the health and public safety of our citizenry, the legal adult use of marijuana should be regulated so that:
(a) Legitimate, taxpaying business people, and not criminal actors, conduct sales of marijuana.
(b) Marijuana sold in this state is tested, labeled and subject to additional regulations to ensure that consumers are informed and protected.
(c) Employers retain their rights to maintain drug-and-alcohol-free places of employment.
(d) The health and safety of employees in the marijuana industry are protected.
(e) Individuals must show proof of age before purchasing marijuana.
(f) Selling, transferring, or providing marijuana to minors and other individuals under the age of twenty-one remains illegal.
(g) Driving, flying or boating while impaired to the slightest degree by marijuana remains illegal.

---

[21] As noted *supra,* the total is now 24 States comprising approximately 180 million and 54.5% of Americans.

75.     Included in the SSAA are provisions, *inter alia*:

(i) declaring, at the outset, what the SSAA does *not do,* including that it does not restrict the rights of employers to adopt and enforce workplace policies regarding marijuana, does not allow driving, flying or boating "while impaired to even the slightest degree by marijuana," and does not allow an individual under the age of 21 to purchase, possess or consume marijuana, A.R.S. § 36-2851;

(ii) declaring as "lawful" the purchase, possession, personal use, transportation and transfer of Adult Use marijuana, subject to prescribed quantity limitations, A.R.S. § 36-2852;

(iii) defining conduct violating the SSAA, including possession of quantities in excess of the prescribed limitations or by persons under the age of 21, and prescribing civil penalties and fines, A.R.S. § 36-2853;

(iv) requiring the Arizona Department of Health Services to adopt rules to regulate Adult Use marijuana, and to license and register facilities that produce, test, distribute and sell Adult Use marijuana, as well as imposing dosage restrictions, warning labels, and child-resistant packaging, A.R.S. §§ 36-2854, 2855, 2858;

(v) regulating marijuana-related advertising, A.R.S. §36-2859; and

(vi) providing for the expungement of prior criminal records related to the personal possession of marijuana that, generally, would otherwise be lawful or subject to minimal civil penalties had the SSAA been in effect at the time of the arrest, charge or conviction, A.R.S. § 36-2862.

76.    Under the SSAA, the people of Arizona have democratically approved the imposition of a 16% excise tax on revenues from the sale of Adult Use marijuana, as well as a system operated by Arizona for the collection and distribution of the excise tax revenues. Medical marijuana sales are not subject to the excise tax. A.R.S. § 42-5452.

77.    Adult Use excise tax revenues are allocated under the SSAA as follows: (a) 33% to community college and provisional community college districts; (b) 31.4% to public safety, including police and sheriffs, fire departments, fire districts and first responders; [22] (c) 25.4% to the Arizona Highway User Revenue Fund; and (d) 10% to the justice reinvestment fund, which is dedicated to providing public health services, counseling, job training and other social services for communities that have been adversely affected and disproportionately impacted by marijuana arrests and criminalization. A.R.S. § 36-2856, § 36-2863.

78.    Sales of Medical and Adult Use marijuana are also subject to a Transaction Privilege Tax ("TPT"), which is essentially state and local sales tax. A.R.S. § 36-2864.

---

[22] The recent California wildfires were devastating and tragic. Arizona, however, also has one of the largest risks for wildfires in the United States. In 2020 there were more than 2500 Arizona wildfires burning almost 980,000 acres, including the Bighorn Fire in the Catalina Mountain Foothills (which are within viewing distance from Plaintiff's home) that burned 120,000 acres. On average, Tucson sees between 800 and 1100 brushfires a year. During 2024 more than 300,000 acres burned. And in light of the lack of rainfall from last November to the present, Governor Hobbs recently predicted an "intense" wildfire season for Arizona this year.

79.     The Arizona Department of Revenue publishes reports regarding the Arizona Marijuana TPT and Excise Tax Taxable Sales and Tax Collections.

80.     According to reports published for the period from July 2021 through March 2025 (Exhibit 1 hereto), sales of Medical marijuana in Arizona during that period totaled more than $1.9 billion, and sales of Adult Use marijuana subject to excise tax totaled more than $4 billion.

81.     The same report shows that TPT on the sales of Medical marijuana totaled almost $160 million, TPT on sales of Adult Use marijuana totaled almost $314 million, and excise taxes on sales of Adult Use marijuana totaled almost $642 million, resulting in total tax collections of more than $1.1 billion.

82.     Under the SSAA registration and licensing requirements for Marijuana Establishments and Marijuana Testing Facilities, [23] (i) only Adult Use marijuana cultivated, produced and distributed within Arizona can be legally sold to, purchased, transported, possessed and used by Plaintiff and others, *.e.g.* A.R.S. § 36-2854, Paragraph M, and (ii) the related revenue and tax collection and tax disbursement activities take place solely within Arizona, *e.g.,* A.R.S. § 36-2864, § 36-2856.

---

[23] Generally, a "Marijuana Establishment" is defined under the SSAA as an entity licensed by Arizona to cultivate, manufacture, package, or sell Marijuana to consumers, A.R.S. § 36-2850, Paragraph 18, and a "Marijuana Testing Facility" is defined as an entity licensed by Arizona to analyze the marijuana for potency and the existence of any harmful contaminants, A.R.S. § 36-2850, Paragraph 21.

**C.      How Adult Use Marijuana is Sold to, Packaged and Purchased by Plaintiff and Others in Arizona Under the SSAA**

83.     Under the SSAA, Adult Use marijuana is sold to Plaintiff and other consumers in Arizona by and at designated retail Marijuana Establishments ("dispensaries"), A.R.S. § 36-2850, Paragraph 6 and Paragraph 18, Subsection a.

84.     The number of dispensaries in Arizona is subject to prescribed limitations under the SSAA. 36 § 2854, Paragraph A, Subsections 1.b, 1.c.

85.     Recent reported numbers of dispensaries nationwide exceed 15,000, with approximately 300 in Arizona. In Tucson, where Plaintiff resides, there are more than 15 dispensaries, most of which sell both Medical and Adult Use marijuana.

86.     Plaintiff purchases only Adult Use marijuana and does not have a medical registry identification card to purchase Medical marijuana.

87.     The D2 Eastside Dispensary ("D2"), a "neighborhood" dispensary where Plaintiff purchases much of his Adult Use marijuana, is representative of the Tucson dispensaries (https://d2dispensary.com/east).[24]

88.     At D2, Medical and Adult Use marijuana can be ordered both online and at the dispensary for purchase and pick-up at the store. Delivery has been available for some time to Arizona Medical marijuana patients with a current medical registry

---

[24] In addition to the D2 Eastside Dispensary, D2 also operates its Downtown Dispensary, which is located less than one mile from the federal District Courthouse (https://d2dispensary.com/downtown), and recently opened a Westside (Oracle Road) Dispensary (https://d2dispensary.com/oracle-rd). The three dispensaries carry many of the same products, though their inventories are not identical. Additionally, many of the Medical and Adult Use marijuana products are the same, the difference being the exclusion of Medical marijuana from the 16% Adult Use excise tax.

identification card, and the delivery of Adult Use marijuana was approved effective January 1, 2025 pursuant to A.R.S. § 36-2854(D).

89.     All Adult Use marijuana consumers are required under the SSAA to provide suitable government-issued identification to the dispensary to confirm they are at least 21 years of age. A.R.S. § 36-2854, Paragraph A, Subsection 6.

90.     The identification is presented upon entry to the dispensary and when purchasing the selected products at the pick-up windows. Purchases must be in cash, or by debit card or debit-card app payment service with an additional transaction fee, and there is an ATM located inside the dispensary.

91.     The D2 website shows all of the different Adult Use marijuana products that are available for purchase and their price—typically more than 500 Adult Use marijuana products.

92.     Consumers are provided with a wide range of information about the products' different characteristics to assist in choosing their Adult Use marijuana products. There can be hundreds of variations in the products available for purchase, including different packaging categories, lineages and strains, the concentrations and chemical composition of different specific active ingredients including THC and CBD, producer brands, and package quantity, all of which can impact each product and its properties and effects.

93.     The D2 website enables a consumer to filter the hundreds of Adult Use marijuana products by six general packaging categories. The categories include:

(i) flower (the dried flower bud of a female marijuana plant);

(ii) vape cartridges and disposables (generally marijuana liquid or oil consumed using an included or separate e-cigarette mechanism);

(iii) pre-rolls (flower rolled into a marijuana cigarette—i.e., a "joint");

(iv) edibles (including gummy candies in numerous flavors, chocolates, baked goods, drinks and capsules/tablets);

(v) concentrates (generally stronger marijuana resin products consumed by other than a vape pen); and

(vi) topicals (marijuana-infused oils, creams and lotions that are intended for application directly to the skin, hair or nails).

94.    Generally there are 50 to more than 150 products to choose from for each of the flower, vape, pre-roll, edible and concentrate product categories.

95.    Marijuana lineage is comprised of indica, sativa, indica-hybrid and sativa-hybrid. Indica and sativa are distinct marijuana "species" of plants with distinct differences in appearance[25] generally producing different effects when consumed:

(i) Indica offers relaxing effects that may also help to reduce pain, increase appetite and aid sleep;

(ii) Sativa produces a more mood-boosting, euphoric and stimulating effect.

---

[25] Indica has broad, dark green leaves that grow on short, bushy plants, whereas Sativa has light green and skinny leaves which grow on tall, slim plants.

(iii) Hybrids are formulated to produce varying combinations of effects from both lineages, and a hybrid may lean more towards relaxation if it has more indica in its lineage or alertness if it has greater levels of sativa.

(iv)  Beyond the basic lineage categories of indica, sativa and hybrid, there are more than 700 different marijuana strains which can be sold individually or in hybrid combinations.

(v) Additionally, the different marijuana strains and products can have substantial differences in the combinations of terpenes, flavonoids, CBD and other naturally-occurring compounds with different properties that influence the taste and the therapeutic and euphoric effects produced.

96.    For example, the more than 100 flower and pre-roll products offered by D2 on any given day might consist of more than 20 different strains and combination of strains known generally for their distinct effects including Acapulco Gold, Fatso, Gelato, Guava Cross, Jet Cream, Kosher Kush, Wedding Cake, and many more.

97.    The D2 website also identifies the effects connected with a particular product. Among the effects are: (i) happy; (ii) calm (iii) relaxed; (iv) energetic (v) sleepy; (vi) creative; (vii) focused; and (viii) inspired. These effects generally correlate to the indica, sativa or hybrid lineage of the product. All of the strains named above list "happy" as an effect, as do many of the other strains offered.

98.    The same and different strains can be offered under as many as 20 or more brands. Furthermore, the same strain may have either higher or lower THC and

CBD concentrations depending on the producer and even the particular batch at a particular time by the producer.

99.    To comply with the quantity limitations of the SSAA, the Adult Use marijuana products are generally sold in weight measures by grams for smoked products, and in milligrams for edible products.

100.    Pre-rolls generally may include .5 gram, 1 gram or up to 2 grams, in combinations from 1 to as many as 6 packaged joints. Packages of flower are generally sold by grams or ounces, either 3.5 grams (1/8 ounce), 7 grams (1/4 ounce) or 14 grams (1/2 ounce).

101.    By comparison, a package of edible gummies may include a total of 100 milligrams of THC (the limit for any individual packaged edible product under the SSAA, *see* A.R.S. § 36-2854, Paragraph A, Subsection 7), either with 10 ten milligram pieces or 20 five milligram pieces by which a consumer can decide what amount of THC to consume.

102.    There is a wide range of prices for the different products. For example, single pre-rolls have recently been available for purchase for as little $5.00 for the D2 Downtown Flower ("DTF") house brand when on sale, and at other times up to as much as $30 or more for multi-gram pre-rolls of other brands infused with additional concentrated cannabis products.

103.    The D2 website also includes access to professional test lab results when provided by the producer for, *inter alia*, THC and CBD concentration, terpene composition and absence of contaminants.

104.    Adult Use marijuana products sold and purchased in Arizona include labels with detailed identifying information for each product. For example, a pre-roll label may include such information as: (i) Producer ID #; (ii) Strain; (iii) Lineage Dominance (Indica, Hybrid or Sativa); (iv) Package ID #; (v) Weight; (vi) Production Batch #; (vii) Harvest Date; (viii) Manufacture/Package Date; (ix) THC percentage; and (x) CBD percentage.

105.    As varied as is the number of different products offered by a dispensary like D2, comparable varieties of entirely different products will be found at different dispensaries throughout Tucson, each carrying their own selection of "house" and other different brands, subject to some cross-over for certain popular brands that many dispensaries may carry.

106.    The websites for other dispensaries generally also include the same type of information regarding the effects of the various products, among other information. Thus, there are literally thousands of Adult Use marijuana products available for purchase by consumers throughout the greater Tucson metropolitan area.

107.    As the SSAA's name confirms, the people of Arizona have declared that Adult Use marijuana can be used safely and responsibly by Plaintiff and other adults 21 years and older, and are provided with extensive information to do so.

108.    Plaintiff and other adult consumers behaving responsibly can control the intensity of the relaxation, euphoria and other effects they may want to experience based, *inter alia*, on the form in which the marijuana is consumed (i.e., smoking

flower vs. vape vs. edible), the lineage dependent effects they may want to experience, and the amount of THC they want to consume.

109.    Because the Adult Use marijuana products are quality tested and their THC and CBD content percentages disclosed, Plaintiff and others can calculate the approximate dosage of THC and CBD they want to consume for the intensity of the effects produced.

110.    For example, when the disclosed THC percentage of a flower product is multiplied by ten, that is the number of milligrams of THC per gram (1000 milligrams). A pre-roll or flower that has a 20% THC content will have 200 milligrams of THC per gram. And the form in which the product is consumed affects how much THC will be in each delivery. Other criteria such as sex, weight, and the experience with and frequency of marijuana use can also be factored in if desired.

111.    For smoking, vaping, and resin concentrates, the THC is delivered directly into the bloodstream and produces immediate effects. By contrast, the THC in edibles takes longer to produce its effects because it is first delivered to the stomach and then the liver, which converts the THC into a stronger form than smoking and which results in more intense effects after being delivered to the bloodstream.[26]

---

[26] Because of these differences in how the THC is consumed and absorbed, the SSAA imposes different quantity limitations on the possession of smokable Adult Use marijuana products (one ounce) and edibles and concentrates (five grams), A.R.S. § 36-2852 Paragraph A, Subsection 1. As noted *supra,* the packaging limitations on edible products are no more than 10 milligrams of THC per individual edible or 100 milligrams per package, A.R.S. § 36-2854 Paragraph A, Subsection 7.

112.    Based on all of these different factors and effects, Plaintiff and others can decide which Adult Use marijuana products they want to purchase and consume and how much they want to spend, and can try different products and quantities and characteristics and effects depending on how they want to feel and how a product makes them feel.

113.    If Plaintiff and other consumers don't appreciate the effects of a particular product, they can find another one they like better.

114.    Finally, under the SSAA, each Adult Use marijuana product sold and purchased must come in a child-resistant container that includes a label with accurate warnings regarding the risks of its use. A.R.S. § 36-2854, Paragraph A, Subsection 5. For example, a pre-roll that Plaintiff purchased at D2 included the following warning on the label to enabled an informed choice:

> ARIZONA DEPARTMENT OF HEALTH SERVICES WARNING: Marijuana use can be addictive and can impair an individual's ability to drive a motor vehicle or operate heavy machinery. Marijuana smoke contains carcinogens and can lead to an increased risk for cancer, tachycardia, hypertension, heart attack, and lung infection. Marijuana use may affect the health of a pregnant woman and the unborn child. KEEP OUT OF REACH OF CHILDREN

## D.    The Federal Marijuana Prohibition

### 1.    Relevant Federal Statutes

115.    The CSA begins with 21 U.S.C. § 801, "Congressional findings and declarations."

116.    21 U.S.C. § 801(2) states: "The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."

117.    21 U.S.C. §§ 801(3)-(6) set out Congress's reasons for extending the CSA to not only interstate but also intrastate "traffic" in controlled substances:

(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because—
       (A) after manufacture, many controlled substances are transported in interstate commerce,
       (B) controlled substances distributed locally usually have been transported in interstate commerce immediately before their distribution, and
       (C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.
(4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.
(5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.
(6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.

118.    21 U.S.C. § 802 includes the CSA definitions.

119.    21 U.S.C. § 802(6) defines a "controlled substance":

(6) The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter. The term does not include distilled spirits, wine, malt beverages, or tobacco[.]

120.    "Marihuana/Marijuana" is defined in § 802(16)(A) to mean "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin."

121.    As further discussed at length *infra*, the 2018 Agricultural Farm Act ("Farm Act") excluded "hemp," as defined in 7 U.S.C. § 1639*o*, from the definition of marijuana in § 802(16)(A). *See* § 802(16)(B).

122.    Under 7 U.S.C. § 1639*o*(1), "hemp" is defined as the Cannabis sativa L plant "with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."

123.    21 U.S.C. § 812(c) sets out Schedules I-V of controlled substances governed by the CSA. Schedule I includes those controlled substances that Congress has said in § 812(b)(1) have "a high potential for abuse," "no currently accepted medical use in treatment," and "a lack of accepted safety for use of the drug or other substance under medical supervision."

124.    Schedule I, § (c)(10), is "marihuana," and § (c)(17) is "tetrahydrocannabinols" (except tetrahydrocannabinols in hemp as defined in 7 U.S.C. § 1639*o*).

125.    21 USC § 841(a)(1) makes it "unlawful for any person knowingly or intentionally [] to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, [marijuana]," and § 841(b) imposes potential

prison sentences of years or decades and financial penalties in the tens or hundreds of thousands or more dollars for violations specifically including large quantities of marijuana.

126.    21 U.S.C. § 844(a) provides the criminal penalties for simple possession of marijuana and other controlled substances "unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice." Medical marijuana prescribed under state law is not excepted, because under Schedule I, Congress has said that marijuana has no "currently accepted medical use in treatment" and "a lack of accepted safety for use of the drug … under medical supervision."

127.    21 U.S.C. § 844(a) treats a first conviction for simple marijuana possession as a federal misdemeanor, and any subsequent convictions as felonies:

> Any person who violates this subsection may be sentenced to a term of imprisonment of not more than 1 year, and shall be fined a minimum of $1,000, or both, except that if he commits such offense after a prior conviction under this subchapter … he shall be sentenced to a term of imprisonment for not less than 15 days but not more than 2 years, and shall be fined a minimum of $2,500, except, further, that if he commits such offense after two or more prior convictions under this subchapter … he shall be sentenced to a term of imprisonment for not less than 90 days but not more than 3 years, and shall be fined a minimum of $5,000.

128.    Under 21 U.S.C. § 841(b)(4), "distributing a small amount of marihuana for no remuneration" is also treated as provided under § 844.[27]

---

[27] 21 U.S.C. § 802(11) defines "distribute" as "to deliver … a controlled substance," and § 802(8) defines "deliver" or "delivery" as "the actual, constructive, or attempted transfer of a controlled substance …, whether or not there exists an agency

129.    21 U.S.C. § 903, "Application of State Law," does not preempt or prohibit State laws that criminalize marijuana, but prohibits and preempts State laws that legalize Medical and Adult Use marijuana:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

130.    21 U.S.C. § 901 governs severability:

> If a provision of this chapter is held invalid, all valid provisions that are severable shall remain in effect. If a provision of this chapter is held invalid in one or more of its applications, the provision shall remain in effect in all its valid applications that are severable.

### 2.    The Shifting Federal Enforcement Response to the Legalization of Marijuana by the States

#### a.    The Ogden and Cole Memorandums

131.    Between October 2009 and February 2014, DOJ issued a series of four memorandums providing U.S. Attorneys with advice on how to deal with the growing legalization first of Medical marijuana and then Adult Use Marijuana by the States despite marijuana's continuing full illegalization under the CSA and federal law.[28]

---

relationship." Thus, an act of generosity like giving a small amount of marijuana to, or sharing it with, family or friends is also criminalized under § 844(a).

[28] Attached together as one Exhibit 2 are the October 29, 2009 Memorandum by Deputy Attorney General David Ogden ("Ogden Memo"), the June 29, 2011 Memorandum by Deputy Attorney General James M. Cole ("2011 Cole Memo"), the August 29, 2013 Memorandum by Cole ("2013 Cole Memo"), and the February 14, 2014 Memorandum by Cole ("2014 Cole Memo").

132.    The Ogden Memo was intended to provide "clarification and guidance to federal prosecutors in States that have enacted laws authorizing the medical use of marijuana."

133.    The 2011 Cole Memo was intended to address the "increase in the scope of commercial cultivation, sale, distribution and use of marijuana for purported medical purposes," including state laws that "authorize multiple large-scale, privately-operated industrial marijuana cultivation centers … [with] revenue projections of millions of dollars based on the planned cultivation of tens of thousands of cannabis plants."

134.    The 2013 Cole Memo was intended to update the guidance in the Ogden and 2011 Cole Memos "in light of state ballot initiatives that legalize under state law the possession of small amounts of marijuana and provide for the regulation of marijuana production, processing, and sale."

135.    Because the 2013 Cole Memo did not do so, the 2014 Cole Memo was intended to "specifically address what, if any, impact [the 2013 Cole memo] would have on certain financial crimes for which marijuana-related conduct is a predicate."

136.    Although focusing on different aspects of the developing changes in the scope of state legalization, the four memos have common themes:

(i) The guiding principal in connection with the enforcement of the federal marijuana laws by DOJ was the "efficient and rational use of its limited investigative and prosecutorial resources" and, therefore, compliance with state

legalization laws (first for Medical marijuana and then for both Medical and Adult Use Marijuana) generally rendered federal enforcement a lesser priority;

(ii) One consistent DOJ enforcement priority was the prosecution and disruption of marijuana and other drug cultivation illegal under state law, manufacturing and trafficking by criminal enterprises, gangs and cartels, and money laundering in violation of federal banking and other laws;

(iii) Other enforcement priorities included prevention of distribution of marijuana to minors, diversion of marijuana from states where it is legal to states where it is not, drugged driving, and distribution, possession and use on federal property; and

(iv) Nothing in the memos or the fact that marijuana-related conduct was authorized by state law provided a defense to the CSA and federal law, even if in compliance with state law, and nothing in the memos precluded investigation or prosecution that otherwise served an important federal interest.

137.    Finally, the 2013 Cole Memo addressed the historical relationship between the federal and state enforcement of marijuana laws and the impact of the progressively more expansive state laws legalizing marijuana:

> [T]he federal government has traditionally relied on states and local law enforcement agencies to address marijuana activity through enforcement of their own narcotics laws. For example, the Department of Justice has not historically devoted resources to prosecuting individuals whose conduct is limited to possession of small amounts of marijuana for personal use on private property. Instead, the Department has left such lower-level or localized activity to state and local authorities[.]

The enactment of state laws that endeavor to authorize marijuana production, distribution, and possession by establishing a regulatory scheme for these purposes affects this traditional joint federal-state approach to narcotics enforcement. …

* * *

In jurisdictions that have enacted laws legalizing marijuana in some form and that have also implemented strong and effective regulatory and enforcement systems to control the cultivation, distribution, sale, and possession of marijuana, conduct in compliance with those laws and regulations is less likely to threaten the federal priorities … . In those circumstances, consistent with the traditional allocation of federal-state efforts in this area, enforcement of state law by state and local law enforcement and regulatory bodies should remain the primary means of addressing marijuana-related activity. …[29]

### b.    Subsequent Developments Regarding the Ogden and Cole Memos

138.    On January 4, 2018, U.S. Attorney General Jeff Sessions issued a

memorandum to all U.S. Attorneys expressly rescinding all of the Ogden-Cole-

Wilkinson Memos: "Given the Department's well-established general principles,

previous nationwide guidance specific to marijuana enforcement is unnecessary and is

rescinded, effective immediately."

139.    After Sessions was fired by President Trump on November 7, 2018 for

reasons unrelated to his rescission memorandum, his nominated replacement, William

---

[29] Also potentially relevant to, *inter alia*, Arizona, on October 28, 2014, Monty Wilkinson, Director of the Office of the Director of the Executive Office for U.S. Attorneys of the DOJ, issued a memorandum ("Wilkinson Memo") addressing the impact and application of the 2013 Cole Memo "in the event that sovereign Indian Nations seek to legalize the cultivation or use of marijuana in Indian Country." Noting the DOJ's "limited investigative and prosecutorial resources," the Wilkinson Memo advised U.S. Attorneys to "consult with the affected tribes on a government-to-government basis," and to coordinate with the relevant offices to "maintain consistency throughout the Department."

Barr, was questioned about his views on the Cole Memos and how the federal government should allocate its limited resources in connection with marijuana.

140.    In Barr's response to written questions from senators, he wrote: "As discussed at my hearing, I do not intend to go after parties who have complied with state law in reliance on the Cole Memorandum." Barr also agreed to give "careful consideration" into "whether further administrative guidance would be appropriate following the Cole Memorandum and the January 2018 memorandum from Attorney General Sessions."

141.    Barr was critical of relying on the discretion of U.S. Attorneys in connection with the enforcement of the marijuana laws: "An approach based solely on executive discretion fails to provide the certainty and predictability that regulated parties deserve and threatens to undermine the rule of law."

142.    In light of the fact that a single facility at the University of Mississippi had for half a century maintained a monopoly on the cultivation of marijuana for research, and that the DEA in 2016 announced a process to license additional manufacturers that Sessions blocked, Barr said he supported expanding the number of institutions allowed to grow marijuana for scientific research.

143.    President Biden's U.S. Attorney General, Merrick Garland, was also questioned during his confirmation hearing in February 2021 regarding his views on the Cole Memo, and stated that he would reinstate it.

144.    Additionally, in written responses to the Senate Judiciary Committee in March 2021, Garland stated that he did not believe it was a good use of DOJ

resources to pursue prosecution "of those who are complying with the laws in states that have legalized and are effectively regulating marijuana."

145.    Attorney General Garland reiterated that view regarding marijuana prosecutions during April 26, 2022 congressional hearings, and stated that "the Justice Department has almost never prosecuted use of marijuana."

146.    In fact, the DOJ has prosecuted many thousands of cases for simple possession of marijuana. According to the January 2023 report by the United States Sentencing Commission entitled "Weighing the Impact of Simple Possession of Marijuana," there were a total of 13,772 sentencings for simple possession of marijuana during the period between fiscal year ("FY") 2009 and FY 2021 (including years when the Ogden and Cole Memos were in force).[30]

147.    These sentencings experienced  a marked increase from 686 convictions in FY 2011 to 1238 in FY 2012 to 2169 in FY 2013.

148.    The District of Arizona, where Plaintiff resides, accounted for 10,392 (75.5%) of all of the federal sentencings for simple possession of marijuana from FY 2009 through FY 2021, and thus not only tracked but was the primary source of the marked increase beginning in FY 2012.

149.    According to the report, of the 1,765 offenders whose criminal history category was impacted by a prior marijuana possession sentence, most were male

---

[30] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2023/20230110_Marijuana-Possession.pdf

(94.2%), U.S. citizens (80.0%), and either Black (41.7%) or Hispanic (40.1%). Nearly all (97.0%) of the prior marijuana possession sentences were for state convictions.[31]

### c.    President Biden's Marijuana Pardons

150.    On October 6, 2022, President Biden issued a presidential proclamation providing a full, complete and unconditional pardon to U.S. citizens and lawful permanent residents for the commission or conviction of many federal and District of Columbia simple marijuana possession offenses, regardless of whether the individuals had been charged with or prosecuted for the offenses.

151.    The pardon expressly restored the pardoned persons' full political, civil and other rights. The number of people pardoned was estimated to be in the thousands.

152.    Accompanying President Biden's proclamation was a statement detailing reasons for the proclamation:

> As I often said during my campaign for President, no one should be in jail just for using or possessing marijuana. Sending people to prison for possessing marijuana has upended too many lives and incarcerated people for conduct that many states no longer prohibit. Criminal records for marijuana possession have also imposed needless barriers to employment, housing, and educational opportunities. And while white and Black and brown people use marijuana at similar rates, Black and brown people have been arrested, prosecuted, and convicted at disproportionate rates.
> * * *

---

[31] In Defendant Bondi's January 16, 2025 written responses during her confirmation proceedings to questions submitted by senators regarding the rescheduling of marijuana from Schedule I to Schedule III, and the Cole Memo and her approach to the enforcement of the federal prohibition in states where marijuana has been legalized, she consistently stated the following: "If confirmed, I will give the matter careful consideration after consulting with appropriate Department Officials."

> [I] am urging all Governors to do the same with regard to state offenses. Just as no one should be in a Federal prison solely due to the possession of marijuana, no one should be in a local jail or state prison for that reason, either.
>
> * * *
>
> Too many lives have been upended because of our failed approach to marijuana. It's time that we right these wrongs.

153.    On December 22, 2023, President Biden issued another presidential proclamation that expanded the relief in the October 6, 2022 proclamation by providing a full, complete and unconditional pardon to U.S. citizens and lawful permanent residents for the commission or conviction of the offenses of simple possession of marijuana, attempted simple possession of marijuana, or use of marijuana, regardless of whether the individual had been charged with or prosecuted for the offenses on or before the date of the proclamation. The number of people pardoned was again estimated to be in the thousands.

154.    In the December 22, 2023 proclamation, President Biden expressly noted that the convictions for simple possession of marijuana have imposed needless barriers to employment, housing, and educational opportunities.

### d.    Potential Rescheduling of Marijuana Under the CSA

155.    On October 6, 2022, President Biden also announced that he was directing Cabinet-level agencies to review marijuana's status under federal law.

156.    On August 29, 2023, the U.S. Department of Health and Human Services issued its letter to the DEA recommending that marijuana be rescheduled because of its medical value and currently accepted medical use.

157.    On May 16, 2024, the DOJ submitted to the Federal Register a notice of proposed rulemaking by the DEA to reschedule marijuana from Schedule I to Schedule III of the CSA, and the notice was issued on May 21, 2024.

158.    Rescheduling marijuana to Schedule III would constitute federal legal recognition that marijuana has less potential for abuse than drugs in Schedule I and Schedule II, and that it has currently accepted medical use in treatment in the United States—i.e., that it can be safely and beneficially used. 21 U.S.C. § 812(b)(3).[32]

159.    On July 9, 2024, the House Appropriations Committee passed a federal budget bill that would prohibit the DOJ from using any money to reschedule marijuana or remove it from Schedule I of the CSA. However, the prohibition was not scheduled to take effect until the 2025 fiscal year, and it was unclear whether such a prohibition would ever be approved by the Senate or whether the rescheduling process would continue under the new Administration.

---

[32] During his 2024 campaign, President Trump stated the following on Truth Social in connection with his decision to vote for the legalization of Adult-Use marijuana in Florida (which did not pass):

> As I have previously stated, I believe it is time to end needless arrests and incarcerations of adults for small amounts of marijuana for personal use. We must also implement smart regulations, while providing access for adults, to safe, tested product. As President, we will continue to focus on research to unlock the medical uses of marijuana to a Schedule 3 drug, and work with Congress to pass common sense laws, including safe banking for state authorized companies, and supporting states' rights to pass marijuana laws …that work so well for their citizens."

And during her 2024 campaign, then Vice-President Harris called for the legalization of Adult Use marijuana.

160.    The DEA rescheduling hearing was originally set for December 2, 2024, but on October 31, 2024, the presiding administrative law judge requested additional information and postponed the hearing until tentatively January or February 2025. The hearing was rescheduled for January 21, 2025, but on January 15, 2025, the hearing was postponed by the DEA "pending resolution of an appeal filed by a party to the proceedings." On February 11, 2025, the administrative law judge issued an order leaving it up to the new DEA administrator whether to resume the hearings.

161.    Rescheduling marijuana to Schedule III would be a significant federal policy change allowing its possession to be prescribed by a physician and therefore excluded from criminal possession under 21 U.S.C. § 844(a). However, the Medical and Adult Use marijuana products that are legal under the laws of Arizona and other States are not susceptible to being "controlled" and "dispensed" like the pharmaceuticals and other substances governed by the CSA.

162.    Marijuana is neither produced nor consumed in standard forms. The thousands of different products sold in Arizona and elsewhere vary widely because they have, *inter alia*, different lineages and hybrid lineages, different strains among the more than 700 different strains, different concentrations of THC and CBD, and different combinations in different amounts of terpenes and other chemical components that can vary the effects of each product.

163.    The "problem" with treating marijuana like pharmaceuticals in the federal schedules is illustrated succinctly by Johannes Thrul, Associate Professor of Mental Health at the Johns Hopkins School of Public Health:

[W]hen we say cannabis, in a way it's a misnomer because cannabis is so many things. We have different cannabinoids and different concentrations of different cannabinoids. The main cannabinoids that are being studied are THC and CBD, but there are dozens of other minor cannabinoids and terpenes in cannabis products, all of varying concentrations. And then you also have a lot of different routes of administration available. No standardized "dosage." You can smoke, vape, take edibles, use tinctures and topicals. When you think about the explosion of all of the different combinations of different products and different routes of administration, it tells you how complicated it gets to study this in a rigorous way. You almost need a randomized trial for every single one of those and then for every single indication.[33]

164.    Aside from the thousands of different marijuana products marketed in Arizona and other states, each product can affect each person differently due to such factors as (i) genetics and metabolism, (ii) age, sex and gender, (iii) how the marijuana is consumed, (iv) other medications and substances the person is taking, (v) tolerance, and (vi) previous experience. Thus, one product may provide relief from symptoms like pain or anxiety for some people but not others, and a different product may or may not do the same. Even if the effects can generally be categorized, the precise effects on any person at any one time cannot be predicted with certainty.

165.    Marijuana may have many medical benefits because of or in addition to the "intoxication" it produces, but it is not "medicine" that fits within the framework of the CSA. Marijuana is an "herb" that can be cultivated and crafted by any individual, including licensed cultivators and producers who add their own distinctive touch, techniques and vision as to what the final product can and will be and what its effects will be.

---

[33] https://publichealth.jhu.edu/2023/risks-and-benefits-of-legalized-cannabis

166.    Under the Arizona system for the regulation and administration of marijuana, as opposed to federal "control," marijuana with its thousands of product variations is most akin to intoxicants like the many thousands of different wines and liquors which can also be safely and responsibly used by adults, or like tobacco products, which are legal but dangerous with any use.

### 3.    The "Hemp Loophole"

167.    The cannabis sativa plant included in the definition of marijuana in 21 U.S.C. § 802(16)(A) can be cultivated to produce either marijuana or hemp. Under the 2018 Agricultural Farm Act ("Farm Act"), "hemp" as defined in 7 U.S.C. § 1639*o* was excluded by 21 U.S.C. § 802(16)(B) from the definition of marijuana. Hemp is defined in 7 U.S.C. § 1639*o*(1) as follows:

> "[H]emp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.

168.    Additionally, the Farm Act excluded the tetrahydrocannabinols in hemp as defined in § 1639*o* from the tetrahydrocannabinols otherwise prohibited under 21 U.S.C. § 812, Schedule I, § (c)(17).

169.    The 0.3% dry weight limit for the hemp in § 1639*o* does not prevent the production of Delta-8 THC, a tetrahydrocannabinol distinct from Delta-9. The Delta-8 THC is the result of extracting the THC from the hemp CBD and then synthesizing it to produce the Delta-8 THC in a concentrated form.

47

170.    Thus, under the Farm Act, it is the *source* of the THC that controls whether it is legal under federal law—even though the Delta-8 THC derived from hemp is another tetrahydrocannabinol that can have effects comparable to the Delta-9 THC in marijuana products that are prohibited under the CSA but are legal under the laws of Arizona and other States.[34]

171.    As a result, "hemp THC" products which are not subject to safety, labeling and other regulations, including protections for children and other minors, are now being commercially marketed and sold across the United States in convenience shops, gas stations, and other unlicensed facilities.

172.    Because a number of states have simply followed the Farm Act regarding the legality of hemp, the Delta-8 hemp THC is being sold in a number of states where Adult Use marijuana is not legal. Conversely, a number of states that have fully legalized and regulated both Medical and Adult Use marijuana have specifically banned the Delta-8 hemp THC.

173.    On March 11, 2024, Arizona Attorney General Kristin Mayes issued an opinion letter necessitated by the dangers introduced to Arizona and its people— including its children and other minors—because of the federal government's hemp loophole.[35]

---

[34] During his 2019 Senate confirmation proceedings, Attorney General Barr addressed the "hemp loophole" and acknowledged that "[p]roducts derived from hemp, including CBD, are therefore subject to different legal and regulatory restrictions than those derived from non-hemp marijuana plants under certain circumstances."

[35] https://www.azag.gov/sites/default/files/2024-03/I24-005.pdf

174.    In her opinion letter, Attorney General Mayes confirmed that in Arizona Delta-8 THC and other hemp-synthesized products can only be sold through licensed marijuana dispensaries to persons legally entitled to make purchases from the dispensaries. Attorney General Mayes further cited to and quoted a May 4, 2022 Food and Drug Administration ("FDA") advisory[36] regarding the serious public health concerns created by the federal hemp loophole:

> [Delta-8] "may be marketed in ways that put the public health at risk and should especially be kept out of reach of children and pets."
>
> The public-health concerns about delta-8 "include variability in product formulations and product labeling, other cannabinoid and terpene content, and variable delta-8 THC concentrations." And "with no regulatory oversight and limited laboratory testing, most products sold as delta-8-THC are not actually pure delta-8-THC." According to the FDA, "[s]ome manufacturers may use potentially unsafe household chemicals to make delta-8 THC through this chemical synthesis process," and "[t]he final delta-8 THC product may have potentially harmful by-products (contaminants) due to the chemicals used in the process." (citations omitted)

175.    Although certain recent proposals from the Senate and House included provisions to deal with and try to close the hemp loophole in the Farm Act, the spending bill enacted by Congress on December 21, 2024 extended the Farm Act for one year, through 2025, without changes.

176.    The results of the hemp loophole are irrational and perverse. The federal government has legalized and continues to legalize unsafe, unregulated "over the [gas

---

[36] U.S. Food & Drug Administration, *5 Things to Know about Delta-8 Tetrahydrocannabinol – Delta-8 THC* (May 4, 2022), https://www.fda.gov/consumers/consumer-updates/5-things-know-about-delta-8-tetrahydrocannabinol-delta-8-thc

station, convenience store, etc.] counter" hemp THC products widely available to children and other minors, while it continues to adhere to the criminalization of the right of Arizona and Arizonans to regulate and administer the production, distribution, possession and use of Adult Use marijuana that can be obtained only from licensed dispensaries with attendant quality and safety controls for the safe and responsible use by Plaintiff and other adults under Arizona law. [37]

177.    Arizona and other states are now required to take action to address a dangerous unregulated THC product introduced to the public under federal law.

### 4.    The Prohibition on Firearm Ownership Because of Marijuana Use

178.    18 U.S.C. § 922(d)(3) prohibits the sale or other disposition of firearms or ammunition to users of marijuana:

> (d) It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person, including as a juvenile–
>   (3) is an unlawful user of or addicted to any controlled substance (as defined in [21 U.S.C. § 802 of the CSA]).

---

[37] With respect to distribution of marijuana to children and other minors, the 2013 Cole Memo (Exhibit 2 hereto) is particularly relevant:

> [T]he Department's interest in preventing the distribution of marijuana to minors would call for enforcement not just when an individual or entity sells or transfers marijuana to a minor, but also when marijuana trafficking takes place near an area associated with minors; when marijuana or marijuana-infused products are marketed in a manner to appeal to minors; or when marijuana is being diverted, directly or indirectly, and purposefully or otherwise, to minors.

179.    18 U.S.C. § 922(g)(3) is the corresponding prohibition for the purchase or possession of any firearm or ammunition by any person "who is an unlawful user of or addicted to any controlled substance (as defined in [21 U.S.C. § 802 of the CSA])."[38]

180.    27 C.F.R. § 478.11 defines an "unlawful user of … any controlled substance" in relevant part as follows:

> [An unlawful user is] any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time.

181.    Form 4473, "Firearms Transaction Record," is used by the Bureau of Alcohol, Tobacco and Firearms ("ATF") within the DOJ to determine whether a transferee/buyer is "prohibited by Federal or State Law from receiving a firearm, or whether Federal or State Law prohibits the sale or disposition of a firearm to" the transferee/buyer.

---

[38] Even though the effects of Delta-8 hemp THC are comparable to the Delta-9 THC of marijuana legal under Arizona law, the exclusion of Delta-8 THC from the CSA renders the prohibitions of § 922(d)(3) and § 922(g)(3) inapplicable to its use.

182.    Section B, Question 21(f), of the Form 4473, which is required to be
completed by the transferee/buyer, asks the following question that must be answered
"yes" or "no" and includes the warning that follows:

> Are you an unlawful user of, or addicted to, marijuana or any depressant,
> stimulant, narcotic drug, or any other controlled substance?
> **WARNING:** The use or possession of marijuana remains unlawful under
> Federal law regardless of whether it has been legalized or decriminalized
> for medicinal or recreational purposes in the state where you reside.

183.    The Form 4473 certification that follows all of the subparts of Section B
states the following in relevant part (bold in original):

> **I certify that my answers in Section B are true, correct, and complete.
> … I understand that a person who answers "yes" to any of the
> questions 21.b. through 21.l. as well as 21.n. is prohibited from
> receiving, possessing, or purchasing a firearm. … I also understand
> that making any false oral or written statement, or exhibiting any false
> or misrepresented identification with respect to this transaction, is a
> crime punishable as a felony under Federal law, and may also violate
> State and/or local law.**

184.    On September 21, 2011, Arthur Herbert, ATF Assistant Director,
Enforcement Programs and Services, issued an "OPEN LETTER TO ALL FEDERAL
FIREARM LICENSEES."[39] Herbert's letter confirmed that anyone who was a
marijuana patient using Medical marijuana legally under State law was prohibited by
18 U.S.C. § 922(g)(3) and 27 C.F.R. § 478.11 from possessing firearms or
ammunition and was required to answer "yes" to the "current user" question on Form
4473.

---

[39] https://www.pennlago.com/wp-content/uploads/September-21-2011-OPEN-
LETTER-TO-ALL-FEDERAL-FIREARMS-LICENSEES.pdf

185.    The September 21, 2011 Herbert letter further confirmed that the firearms licensee was prohibited from transferring any firearm or ammunition to such "current user," and that knowledge by the licensee that the potential transferee was in possession of a state medical marijuana card constitutes "reasonable cause to believe" the person is a "current user."

**E.    Plaintiff's Possession and Use of Marijuana**

**1.    Plaintiff's Marijuana Use Prior to Moving to Arizona**

186.    Plaintiff first began using marijuana during high school in 1969 along with many of his friends and acquaintances, and continued to use marijuana regularly throughout high school and then through college graduation in 1976. Marijuana was readily available to Plaintiff and his friends and acquaintances during this entire time.

187.    After college graduation while working before law school, and then during law school 1980-83, Plaintiff smoked marijuana occasionally but infrequently, sometimes a small amount from his own very limited supply or when one of his work colleagues or law school friends would share some with him.

188.    After graduating law school in 1983 and moving to New York in 1984, Plaintiff smoked marijuana only a handful of times with friends who shared it with him, and did not do so again for some two decades.

189.    For Plaintiff's 50th birthday in 2004, a close friend gave him a joint, but Plaintiff didn't smoke it for two years, until December 2006.

190.    It was a powerful, eye-opening, joyous experience. Plaintiff listened to music, enjoyed wine, and thought repeatedly about how happy he felt, about his beloved family and friends some living and some dead, about God and religion, and about how vibrant and spacious and detailed and alive the music sounded and how deeply the lyrics resonated spiritually.[40]

191.    Plaintiff also thought about the law, in particular the federal criminalization of him and his use of marijuana, and his conviction that it was totally unjust and wrong.

192.    Plaintiff continued to smoke marijuana occasionally, when he could listen to music and relax, until moving to Arizona in July 2021.

193.    Smoking marijuana also provided Plaintiff with several instances of overwhelming medical benefits, including four days of relief from the severe pain of a knee injury in or after 2006, and substantial short-term relief from agonizing sciatica attacks in 2014 and 2020.

---

[40] Music is particularly important to Plaintiff, who since the late 1980's had been an "audiophile" dedicated to maximizing the quality of his stereo system for the reproduction of his substantial recorded music collection. His system's extremely high quality musical reproduction was consistently, substantially enhanced when he smoked marijuana.

### 2. Plaintiff's Choice to Move to and Become a Permanent Resident of Arizona

194.    After having lived in the New York metropolitan area for many decades, Plaintiff and his spouse began in and after 2018 to consider where to permanently relocate outside of New York.

195.    For several years they considered many possibilities across the country, of which Arizona was one.

196.    On the evening of the 2020 presidential election, November 3, 2020, Plaintiff suggested to his spouse and she tentatively agreed that they give Tucson, Arizona a try.

197.    Apart from its natural beauty and climate, a material reason for Plaintiff's suggestion that evening was because Arizona had just voted during the election to legalize Adult Use marijuana—an action confirming to Plaintiff the libertarian commitment of the people of Arizona to individual freedom.

198.    Plaintiff was also attracted to Arizona because of its and the Old West's colorful gun history, which several decades before played a large part in persuading him that firearm ownership is a fundamental right under the Second Amendment.

199.    Plaintiff had never actually handled or learned to handle a handgun, but he specifically intended to take a handgun course after moving to Arizona, and possibly purchase one to keep in his home.

### 3.    Plaintiff's Possession and Use of Marijuana Since Moving to Arizona

200.    Plaintiff now has ready access to the entire range of Adult Use marijuana products, and currently possesses a small amount of these products (kept in his Arizona room and nowhere else in his home) that are well within the quantity limits under the SSAA.

201.    Plaintiff uses marijuana intermittently, maybe one or two times a week. He generally prefers to smoke rolled flower, which takes effect quickly and generally is predictably consistent.

202.    Most times Plaintiff takes just a single puff in the evening.  It consistently quickly eases the pain of his severe cervical stenosis, enabling him to turn his head without discomfort. It can also help with his occasional lumbar and other arthritic pain. The effects progress to greater relaxation, and when combined with a small late-night glass of fortified wine, whisky or other liquor, has repeatedly helped Plaintiff sleep six or more hours through the night and wake up feeling refreshed, which is a relatively rare occurrence on account of his ever-increasing age.

203.    The medical relief from marijuana is a shared experience among members of Plaintiff's family and friends. Relatives in their 90's swear by the pain relief they get using a marijuana ointment. Other relatives have experienced relief from spinal or arthritic pain caused by serious spinal conditions. Others use it to aid in relaxation and sleep.

204.    Occasionally Plaintiff will smoke 4-5 puffs during the course of an afternoon or evening, sit back and listen to music on his stereo system (which always sounds even better), daydream, enjoy some wine and food, and after several hours relax and watch a movie or program on television, feeling very refreshed. [41]

205.    Whether a single puff or larger amount, Plaintiff's use of marijuana generally follows a consistent course: initially a combination of stimulated mindfulness and euphoria (with pain relief) which flows into more pronounced relaxation and then feeling refreshed or sleepy depending on the time of day.

206.    This past Sunday, April 27th, Plaintiff suffered a potentially (but luckily not) catastrophic hard fall. The initial pain centered on his coccyx where he landed, and progressively radiated to other limbs over the next several hours. By yesterday, April 28, Plaintiff was sore literally all over, from his neck to his knees, and the pain was intense enough to cause him to moan when getting in and out of his car.

207.    Yesterday evening, after completing his work on this action, Plaintiff took two ibuprofen tablets (his maximum dosage without potential nausea), drank a healthy glass of wine, and took one puff of a Kosher Kush indica pre-roll. For more than 90 minutes, Plaintiff was entirely pain free *everywhere,* and then mostly pain free

---

[41] Marijuana frequently enhances Plaintiff's spirituality, and God and spirituality are addressed many times in music he listens to. For example, during recent listenings, the songs *My Sweet Lord* (George Harrison), *That's the Way God Planned It* (Billy Preston), *God* (John Lennon), and *Great Day* (Paul and Linda McCartney) resonated deeply religiously and spiritually. And many repeatedly enjoyable songs are about marijuana, *e.g., Rainy Day Women Nos. 12 & 35* (Bob Dylan), *Rainy Day, Dream Away* (Jimi Hendrix), and *Let's Go Get Stoned* (Joe Cocker).

for another 90 minutes. Plaintiff then went to bed, slept for more than six hours uninterrupted, and awakened feeling refreshed. And the marijuana released his happiness, both spiritually and because he was pain-free. Neither the ibuprofen and wine individually or combined could have provided that kind of complete relief.

208.    Despite the fact that marijuana eases pain and stress, aids in relaxation and sleep, enhances spirituality and promotes happiness, and that Plaintiff's use is authorized and legal under the laws of Arizona, he is personally and reputationally stigmatized as a criminal by the federal government, and federal courts have characterized his marijuana use as "*evil*."

209.    Virtually the entire United States says Plaintiff's use of marijuana for medical relief is neither criminal nor "evil," and Arizona and 23 other States comprising a majority of the people of the United States have decided the same of Plaintiff's responsible and safe consumption of Adult Use marijuana for its multiple other benefits.

210.    Plaintiff is a pantheist, and firmly believes that marijuana—which eases pain and stress, aids in relaxation and sleep, enhances spirituality and promotes happiness—is not "evil," but is good, and a blessing, and a gift from God. [42] And nothing the federal government says or does will ever make him believe otherwise.

---

[42] Genesis 1:29: "God said, 'See, I give you every seed-bearing plant that is upon all the earth, and every tree that has seed-bearing fruit; they shall be yours for food.'"

## COUNT I

## Declaratory and Corresponding Injunctive Relief – Amendment IX

211.    Plaintiff realleges and incorporates each and every allegation set forth in the Complaint as if set forth verbatim herein.

212.    The Ninth Amendment to the Constitution provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

213.    To "retain" is "to keep in possession or use" and "to hold secure and intact."[43]

214.    The terminology of the Ninth Amendment regarding "rights … retained by the people," along with similar terminology in the First, Second and Fourth Amendments, preserve and codify "individual rights." *Heller,* 554 U.S. at 579.

215.    The plain language of the Ninth Amendment states that at the time of the ratification of the Constitution, the people had and retained certain unenumerated rights in addition to the rights expressly enumerated in the Constitution.

216.    The Declaration of Independence recognizes that the "pursuit of happiness" is an "unalienable" right—*distinct from life and liberty* that are enumerated in the Constitution: "We hold these truths to be self-evident, that all men

---

[43] https://www.merriam-webster.com/dictionary/retain  "The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller,* 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague,* 282 U.S. 716, 731 (1931)).

are created equal, that they are endowed by their Creator with certain unalienable

Rights, that among these are Life, Liberty and the pursuit of Happiness."

217.    An "unalienable right" is a right that is "impossible to take away or give

up."[44]

218.    The state constitutions of seven of the first 14 states to ratify the

Constitution (Pennsylvania, Massachusetts, South Carolina, New Hampshire,

Virginia, New York, Vermont) all included, as a constitutional right, (in words or

substance) "the pursuit of" or "pursuing and obtaining" "happiness" or "happiness

and safety" as an inherent and/or unalienable right.

219.    Additionally, two other of the first 14 states to ratify the Constitution,

Rhode Island and North Carolina, specifically included in their ratifications the

assertion of "certain natural rights" of which posterity cannot be divested or deprived,

including "pursuing and obtaining happiness and safety."

220.    The Federalist Papers primarily authored by Alexander Hamilton and

James Madison urging the ratification of the U.S. Constitution are replete with

references to the purpose of government and the proposed Union under the

Constitution as the best way to promote and ensure "the happiness of the people," and

how the new Constitution was superior to the existing Articles of Confederation for

pursuing and obtaining it.[45] For example:

---

[44] https://www.merriam-webster.com/dictionary/unalienable

[45] https://guides.loc.gov/federalist-papers/full-text  *See* Nos. 1, 2, 5, 9, 14, 15, 20, 22, 30, 31, 38, 40, 41, 43, 45, 46, 56, 57, 59, 62, 71, 78 & 82.

Federalist No. 1 (Hamilton): "I am clearly of opinion it is your interest to adopt [the Constitution]. I am convinced that this is the safest course for your liberty, your dignity, and your happiness.

Federalist No. 43 (Madison): "Two questions of a very delicate nature present themselves on this occasion [of which the first is]: 1. On what principle the Confederation, which stands in the solemn form of a compact among the States, can be superseded without the unanimous consent of the parties to it? …The first question is answered at once by recurring to the absolute necessity of the case; to the great principle of self-preservation; to the transcendent law of nature and of nature's God, which declares that the safety and happiness of society are the objects at which all political institutions aim, and to which all such institutions must be sacrificed.

Federalist No. 62 (Hamilton or probably Madison): "A good government implies two things: first, fidelity to the object of government, which is the happiness of the people; secondly, a knowledge of the means by which that object can be best attained."

221.    Thirty-eight states currently include (in words or substance) the pursuit of and/or obtaining "happiness" or "happiness and safety" as an inherent and/or natural and/or unalienable right in their constitutions. The constitution of Kentucky included it in its 1799 and 1850 versions before subsequent amendment.

222.    Other states, including Michigan, Minnesota, Mississippi, Utah and Washington do not include a specific reference to "happiness" or "happiness and safety" in their constitutions, but do include provisions that track the Ninth Amendment.

223.    Arizona does not include a reference to "happiness" or "happiness and safety" in its Constitution, but Article 2, the Declaration of Rights, § 33, tracks the Ninth Amendment: "The enumeration in this Constitution of certain rights shall not be construed to deny others retained by the people."

224.    However, the understanding by the people of Arizona regarding the unalienability of the "pursuit of happiness" is confirmed by A.R.S. § 15-203(A)(26):

A.  The state board of education shall …

26.  Require pupils to recite the following passage from the declaration of independence for pupils in grades four through six at the commencement of the first class of the day in the schools …:

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness. …

225.    The pursuit of happiness and safety is "deeply rooted in this Nation's history and tradition," "implicit in the concept of ordered liberty," and a fundamental right retained by the people under the Ninth Amendment.

226.    The people of Arizona, by enacting the SSAA, have legalized Adult Use marijuana in furtherance of the fundamental right retained by them under the Ninth Amendment to the pursuit of their individual happiness and safety.

227.    Plaintiff is entitled, under 28 U.S.C. §§ 2201-2202, to:

 (i) a declaratory judgment that the pursuit of happiness and safety is "deeply rooted in this Nation's history and tradition," "implicit in the concept of ordered liberty," and a fundamental right retained by the people under the Ninth Amendment;

(ii) a declaratory judgment that the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona violates his fundamental right to the pursuit of happiness and safety retained by the people under the Ninth Amendment; and

(iii) permanent injunctive relief under the Ninth Amendment prohibiting the enforcement by Defendant and the federal government of the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona.

## COUNT II

## Declaratory and Corresponding Injunctive Relief – Amendment X

228.    Plaintiff realleges and incorporates each and every allegation set forth in the Complaint as if set forth verbatim herein.

229.    The Tenth Amendment to the U.S. Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

230.    The Tenth Amendment refers "'to the people' acting collectively" by and through the reserved powers of the States, *Heller,* 554 U.S. at 579-80, and those "reserved" powers are the powers "kept or set apart or aside for future or special use."[46]

231.    21 U.S.C. § 903 preempts and prohibits the States from enacting:

any State law on the same subject matter which would otherwise be within the authority of the State [where] there is a positive conflict between [a] provision of this subchapter and that State law so that the two cannot consistently stand together.

---

[46] https://www.merriam-webster.com/dictionary/reserved

232.    The full legalization by Arizona and its people of Adult Use marijuana under the SSAA positively conflicts with and cannot consistently stand together with the full illegalization of marijuana under the CSA.

233.    Under CSA §§ 841, 844 and 903, Arizona is prohibited from enacting the SSAA, a law which (i) eliminates the criminalization of Adult Use marijuana, (ii) legalizes and authorizes its production and distribution, and its possession and use by Plaintiff and other adults within Arizona, and (iii) concomitantly legalizes and authorizes the implementation by Arizona of a safer, comprehensive intrastate market system for the regulation, administration, licensing, distribution and taxation of the proceeds of Adult Use marijuana.

234.    The federal government concededly never had and does not have the personnel and resources necessary to enforce the purported "closed regulatory system" and "watertight nationwide prohibition" of marijuana under the CSA, and thus has relied on Arizona and the other states almost exclusively to prevent the intrastate production, distribution, possession and use of marijuana.[47]

235.    Under the CSA, the only choice given to Arizona and other States is either to engage in actions with respect to intrastate marijuana that have the effect of enforcing the federal criminal law or do nothing, and if Arizona and other States do nothing, then under the CSA the entire market for marijuana, which will always exist

---

[47] *Cf. Printz v. United States,* 521 U.S. 898, 922 (1997) ("The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.").

regardless of the federal law and cannot be eliminated by the federal government with its "limited investigative and prosecutorial resources," will be controlled and operated exclusively by dangerous criminals and criminal organizations.

236.    The CSA excuses the federal government from taking any meaningful actions in connection with marijuana to improve the health, happiness and safety of the people of Arizona, while prohibiting Arizona and its people from adopting alternative policies and an intrastate system for the regulation, administration and taxation of Adult Use marijuana that eliminate the dangerous criminal element and promote and improve the health, happiness and safety of the people of Arizona.

237.    Under the SSAA, Arizona exercises its sovereign power to regulate, administer and tax the intrastate possession and use of Adult Use marijuana by Plaintiff and other Arizonans, *inter alia*, to (i) increase their health and happiness, (ii) improve the quality and safety of the Adult Use marijuana products they use for the many benefits it provides them, (iii) improve Arizona's public safety and highways, (iv) improve Arizona's educational institutions, and (v) provide public health and social services for communities that have been adversely affected and disproportionately impacted by marijuana arrests and criminalization.

238.    The legalization of Medical marijuana by Arizona and the 48 States comprising 98.5% of the population of the United States, and the legalization of Adult Use marijuana by Arizona and the 23 other States comprising a majority of the population of the United States—all in complete disregard of full federal illegalization, and all generating many tens of billions dollars of annual intrastate

sales revenues to grow their economies and many billions of dollars of tax revenues to be used for public purposes—confirm by implication that the legalization of marijuana to protect and promote the health, happiness and safety of the States and their people is reserved to the States under the Tenth Amendment.

239.    Because the Constitution does not "confer[] upon Congress the power to regulate … States," e.g*., Printz, supra*, 521 U.S. at 920 (*quoting New York v. United States,* 505 U.S. 144, 166 (1992)), marijuana's full illegalization by the federal government violates the sovereignty of Arizona and these other States.[48]

240.    Plaintiff is entitled, under 28 U.S.C. §§ 2201-2202, to:

(i) a declaratory judgment that the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal, regulated, administered and taxed under the laws of and by Arizona violates Arizona's State sovereignty under the Tenth Amendment; and

(ii) permanent injunctive relief under the Tenth Amendment prohibiting the enforcement by Defendant and the federal government of the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal, regulated, administered and taxed under the laws of and by Arizona.

---

[48] Implicitly recognizing that the legalization and regulation of intrastate marijuana is reserved to the States under the Tenth Amendment, a bipartisan coalition of members of Congress recently proposed the "Strengthening the Tenth Amendment Through Entrusting States 2.0 ("STATES") Act" to address that issue. *See* https://joyce.house.gov/posts/joyce-chavez-deremer-mast-blumenauer-and-carter-introduce-legislation-to-protect-states-cannabis-policies.

## COUNT III

### Declaratory and Corresponding Injunctive Relief – Commerce Clause and Necessary and Proper Clause

241.    Plaintiff realleges and incorporates each and every allegation set forth in the Complaint as if set forth verbatim herein.

242.    Article I, § 8, of the Constitution vests Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its authority to "regulate Commerce … among the several States."

243.    In *Raich,* the Supreme Court upheld the power of Congress under the "necessary and proper" clause to fully illegalize the solely intrastate "local cultivation and use of marijuana in compliance with [state] law" in order to achieve a "closed regulatory system" and "watertight nationwide prohibition." 545 U.S. at 5.

244.    As stated by the Supreme Court in *Leary*, 395 U.S. at 38 n.68, "[a] statute based upon a legislative declaration of facts is subject to constitutional attack on the ground that the facts no longer exist; in ruling upon such a challenge a court must, of course, be free to re-examine the factual declaration." *Accord United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938): "[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."[49]

---

[49] As further stated in *Carolene Prods, id.* at 153-54, "Similarly we recognize that the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition."

245.    It is undisputed that the findings Congress used in 21 U.S.C. § 801 to justify the CSA's full illegalization of marijuana were "asserted without any supporting evidence-descriptive, statistical, or otherwise." *Raich,* 545 U.S. at 54 (O'Connor, J., dissenting); *accord* 545 U.S. at 64 (Thomas, J., dissenting).

246.    Furthermore, those findings were based on "facts" that "no longer exist" and "have ceased to exist" and relate to a product that "is so different from others of the class as to be without the reason for the prohibition":

(i) Twenty years after *Raich,* forty-eight States regarding Medical marijuana, 24 States regarding Adult Use, and the great to vast majority of the people of the United States, have democratically rejected Congress's finding in 21 U.S.C. § 801(2) that the "manufacture, distribution, and possession and improper use of [marijuana] have a substantial and detrimental effect on the health and general welfare of the American people";

(ii) Because the market for Adult Use marijuana in Arizona is a State administered, highly regulated intrastate market, the "manufacture, local distribution, and possession" of Adult Use marijuana in Arizona (and other States with comparable regulatory systems) does *not* "have a substantial and direct effect upon interstate commerce" relied on by Congress in 21 U.S.C. § 801(3) to justify marijuana's full illegalization because, *inter alia,* Adult Use marijuana legally possessed and used under Arizona law (A) is *not* "after manufacture … transported in interstate commerce," but is transported only to intrastate licensed dispensaries, (B) has been produced within the State and has *not* "been transported in interstate commerce

68

immediately before [its] distribution," and (C) has *not* "flow[ed] through interstate commerce immediately prior to such possession." *Cf.* 21 U.S.C. §§ 801(3)(A), 801(3)(B), 801(3)(C);

(iii) Local distribution and possession of Adult Use marijuana legal under Arizona law cannot "contribute to swelling the interstate traffic in such substanc[e]," because it *eliminates* interstate traffic and the need for interstate traffic. *Cf.* 21 U.S.C § 801(4);

(iv) Adult Use marijuana legal under Arizona law that is "manufactured and distributed intrastate [*can*] be differentiated from controlled substances manufactured and distributed interstate" based on its packaging and regulatory controls, and thus it *is* "feasible to distinguish, in terms of controls, between [marijuana] manufactured and distributed interstate and [Arizona's Adult Use marijuana] manufactured and distributed intrastate." *Cf.* 21 U.S.C. § 801(5); and

(v) "Federal control of the intrastate incidents of the traffic in [marijuana]" *is not and has never been* "essential to the effective control of the interstate incidents of such traffic," because as repeatedly conceded by the federal government, it has always relied almost exclusively on the States for the control of the possession and use of marijuana, and never had and indisputably does not now have sufficient resources to control even a minimal percentage of the intrastate production, distribution, possession and use of marijuana, including Adult Use marijuana legal under Arizona law. *Cf.* 21 U.S.C. § 801(6).

247.   The undisputed facts and history regarding federal enforcement of the CSA's full illegalization of marijuana since *Raich* are inconsistent with and eliminate the ability of the federal government to achieve a "closed regulatory system" and "watertight nationwide prohibition" of marijuana, and preclude a finding that federal control and criminalization of the possession and use of marijuana that is legal under the laws of Arizona and other States is "necessary and proper" any longer:

(i) Congress enabled the government of Washington D.C. to decriminalize Medical marijuana under local ordinance in 2009;

(ii) Congress has affirmatively prohibited the use of federal funds for enforcement of federal marijuana laws against the States' legal Medical marijuana markets in every fiscal year since 2015;

(iii) Starting in 2009 and adapting and evolving since then to the States' ever-expanding, widespread legalization of Medical and Adult Use marijuana, the DOJ has issued and continued policies advising its U.S. Attorneys that it is "efficient and rational" to focus their limited resources on genuinely illegal interstate activity in marijuana, like cartel and organized crime activity, rather than marijuana that is safely produced, distributed, possessed and used in accordance with and effectively regulated and administered under the laws of Arizona and other States;

(iv) Because of the DOJ's limited resources, the federal government has never exercised meaningful "federal control" over intrastate marijuana, but has relied almost exclusively on the states for enforcement of marijuana laws.

(v) Attorneys General Barr and Garland both took the position that they did not intend to enforce the federal marijuana prohibition against those persons and entities complying with state laws that effectively regulate legal marijuana;

(vi) In 2022 and 2023, President Biden issued full pardons for the commission or conviction of many simple marijuana possession offenses, calling the federal prohibition a "failed approach" and encouraging state governments to do the same;

(vii) Both Presidential candidates Trump and Harris rejected the criminalization of marijuana possession and use during their 2024 campaigns; and

(viii) Because of the "hemp loophole" that Congress had the opportunity to but did not fix in 2024, Arizona and other States nationwide have been flooded with dangerous, unregulated interstate hemp THC products readily accessible by children and other minors that produce effects comparable to the safe, regulated intrastate Adult Use marijuana that is legal under the laws of Arizona and other states but illegal under the CSA, forcing Arizona and other States to take action to protect the safety of their people—including their children and other minors—from these dangerous hemp THC products introduced under federal law.

248.    Adult Use marijuana can be safely and responsibly used but is not capable of being regulated under the CSA like pharmaceuticals and other substances because, *inter alia,* there are tens of thousands of different Adult Use marijuana products available across the United States, and their positive effects can be highly variable and subject to many different factors including the form in which a product is

used, its precise chemical composition, and the personal characteristics of each

individual user.

249.    Plaintiff is entitled, under 28 U.S.C. §§ 2201-2202, to:

(i) a declaratory judgment that the federal criminalization of the

possession and use of Adult Use marijuana by Plaintiff which is legal under the laws

of Arizona is not necessary and proper and thus exceeds the outer boundaries of and

violates the Commerce Clause; and

(ii) permanent injunctive relief under the Commerce Clause prohibiting

the enforcement by Defendant and the federal government of the federal

criminalization of the possession and use of Adult Use marijuana by Plaintiff which is

legal under the laws of Arizona.[50]

---

[50] *Raich* did not address claims under the Ninth and Tenth Amendments. However, as recognized by Justice Scalia in his *Raich* concurrence "[a] law is not '*proper* for carrying into Execution the Commerce Clause' '[w]hen [it] violates [a constitutional] principle of state sovereignty.'"545 U.S. at 39, *quoting Printz,* 521 U.S. at 923-24 (emphasis in original).

The facts that existed when the Supreme Court decided the Commerce Clause claim in *Raich* in 2005 bear no resemblance to the nationwide legalization of marijuana by the States totally contradicting Congress's findings under 21 U.S.C. § 801. Additionally, *Raich* preceded the actions of Congress and the Executive Branch affirmatively contradicting and undermining the existence of any "closed regulatory system" and "watertight nationwide prohibition" of marijuana by the federal government upon which *Raich* depended. Plaintiff believes these factors enable the federal courts to distinguish *Raich* and its holding under, *inter alia, Leary* and *Carolene Prods.*, *supra*. Nevertheless, Plaintiff reserves the right to argue in subsequent proceedings in the appropriate forum that *Raich* should be overruled.

## COUNT IV

## Declaratory and Corresponding Injunctive Relief – Amendment II

250.    Plaintiff realleges and incorporates each and every allegation set forth in the Complaint as if set forth verbatim herein.

251.    The Second Amendment to the Constitution provides in relevant part: "[T]he right of the people to keep and bear Arms, shall not be infringed."

252.    Plaintiff moved to Arizona, among other reasons, because of its rich gun history and to learn how to safely and responsibly handle a handgun. [51]

253.    As he anticipated before moving to Arizona, Plaintiff has completed a "Basic Pistol – Fundamental Foundations" class where he was instructed on safe gun handling and storage, types of ammunition, handgun features, functions, cleaning and maintenance, and live-fire marksmanship fundamentals using two different 9mm semi-automatic pistols.

254.    Plaintiff wants to purchase a handgun to keep in his home, but is prohibited from doing so under federal law solely because of his use of Adult Use marijuana which is legal under the laws of Arizona.

255.    Plaintiff refuses, as a lawyer who has been practicing for more than 40 years, to make a felonious false statement on the Form 4473 concealing his use of

---

[51] In fact, Plaintiff was unaware when he moved to Arizona that his possession and use of marijuana that is legal under Arizona law would disqualify him under federal law from purchasing and possessing a handgun. *But see Standing Akimbo LLC,* 141 S. Ct. at 2238 (Thomas, J., Statement respecting denial of certiorari).

Adult Use marijuana in order to purchase and possess a handgun in violation of federal law.

256.    Any attempted justification by the Federal Government for its prohibition is undermined and contradicted by the fact that because Delta-8 hemp THC is excluded from the CSA, the prohibitions of § 922(d)(3) and § 922(g)(3) are inapplicable, and users of Delta-8 hemp THC are entitled to purchase firearms and ammunition even though the effects of Delta-8 hemp THC are comparable to the effects of the Delta-9 marijuana THC that is legal under Arizona law.

257.    Plaintiff will purchase a handgun if his legal entitlement to do so is established by this action

258.    The federal law prohibiting the purchase and possession of firearms and ammunition solely because of the use by Plaintiff of marijuana which is legal under the laws of Arizona is not consistent with and violates his rights under the Second Amendment.

259.    Plaintiff is entitled, under 28 U.S.C. §§ 2201-2202, to:

(i) a declaratory judgment that the application of the federal prohibition under 18 U.S.C. §§ 922(d)(3) and 922(g)(3) to prevent the exercise by Plaintiff of his right to purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona violates his rights under the Second Amendment, and

(ii) permanent injunctive relief under the Second Amendment prohibiting Defendant and the federal government from denying Plaintiff the right to

purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief, and judgment in his favor, as follows:

A.     Under 28 U.S.C. §§ 2201-2202, with respect to Count I:

(i) a declaratory judgment that the pursuit of happiness and safety is "deeply rooted in this Nation's history and tradition," "implicit in the concept of ordered liberty," and a fundamental right retained by the people under the Ninth Amendment;

(ii) a declaratory judgment that the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona violates his fundamental right to the pursuit of happiness and safety retained by the people under the Ninth Amendment, and

(iii) permanent injunctive relief under the Ninth Amendment prohibiting the enforcement by Defendant and the federal government of the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona;

B.     Under 28 U.S.C. §§ 2201-2202, with respect to Count II:

(i) a declaratory judgment that the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal, regulated,

administered and taxed under the laws of and by Arizona violates Arizona's State sovereignty under the Tenth Amendment; and

(ii) permanent injunctive relief under the Tenth Amendment prohibiting the enforcement by Defendant and the federal government of the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal, regulated, administered and taxed under the laws of and by Arizona;

C.     Under 28 U.S.C. §§ 2201-2202, with respect to Count III:

(i) a declaratory judgment that the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona is not necessary and proper and thus exceeds the outer boundaries of and violates the Commerce Clause; and

(ii) permanent injunctive relief under the Commerce Clause prohibiting the enforcement by Defendant and the federal government of the federal criminalization of the possession and use of Adult Use marijuana by Plaintiff which is legal under the laws of Arizona;

D.     Under 28 U.S.C. §§ 2201-2202, with respect to Count IV:

(i) a declaratory judgment that the application of the federal prohibition under 18 U.S.C. §§ 922(d)(3) and 922(g)(3) to prevent the exercise by Plaintiff of his right to purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona violates his rights under the Second Amendment, and

(ii) permanent injunctive relief under the Second Amendment prohibiting Defendant and the federal government from denying Plaintiff the right to purchase and possess firearms and ammunition solely because of his use of marijuana which is legal under the laws of Arizona;

E.      Awarding the costs and disbursements incurred in connection with this action, including fees and expenses, under 28 U.S.C. § 2412 or as otherwise appropriate; and

F.      Granting such other and further relief as the Court deems just and proper.

Dated: April 29, 2025

/s/ William R. Weinstein
    William R. Weinstein
LAW OFFICES OF WILLIAM R. WEINSTEIN
3891 N. Hillwood Circle
Tucson, Arizona 85750
Arizona Bar No: 038995
wrw@wweinsteinlaw.com
Phone: (914) 997-2205

Plaintiff Pro Se